IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 23-4483(L)

———————————

UNITED STATES OF AMERICA,

*Appellee,*

v.

CARLOS BARIOLA A/K/A C-LO, STEPHEN WAYNE PURKS,
A/K/A CITY, AND NATASSIA NICOLE KIMBLE, A/KA PRIMA,

*Appellants.*

———————————

Appeal from the United States District Court
for the Western District of Virginia
at Harrisonburg
*The Honorable Elizabeth K. Dillon, District Judge*

———————————

REDACTED RESPONSE BRIEF OF THE UNITED STATES

———————————

Christopher R. Kavanaugh          S. Cagle Juhan
United States Attorney            Assistant United States Attorney
                                  255 W. Main St., Room 130
                                  Charlottesville, Virginia 22902
                                  (434) 293-4283

*Attorneys for the United States of America*

## Table of Contents

**Page**

TABLE OF AUTHORITIES................................................................. iv

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION...................................................... 2

ISSUES PRESENTED...................................................................... 3

STATEMENT OF THE CASE ............................................................. 4

    A.    Charges in the Operative Indictment................................... 4

    B.    Trial Evidence..................................................................... 5

        1.  Overview of the methamphetamine conspiracy .............. 6

        2.  Evidence of Bariola's identity........................................ 12

        3.  Evidence of Kimble's identity........................................ 13

        4.  The 14 distribution counts against Purks...................... 17

    C.    Suppression Litigation over Purks's Interview................... 21

        1.  The suppression briefs.................................................. 21

        2.  Evidence at the suppression hearing ............................ 22

        3.  The district court's factual findings and ruling ............. 27

STANDARDS OF REVIEW................................................................ 28

SUMMARY OF ARGUMENT.............................................................. 30

ARGUMENT.................................................................................. 33

I.    Bariola and Kimble Were Part of the Drug Conspiracy............... 33

    A.    Bariola waived sufficiency review by failing to renew his motion after putting on evidence.................................. 33

    B.    Substantial evidence proved Bariola and Kimble were members of the conspiracy..................................... 34

        1.  Bariola was C-Lo............................................. 36

        2.  Kimble was Prima and was otherwise part of the conspiracy..................................... 38

II.    Venue Was Proper over Purks's 14 Distribution Counts. ........... 40

    A.    Purks was liable for his co-conspirators' drug distributions.......................................................... 42

    B.    Drug distribution is a continuing offense that establishes venue in any district where the drugs were received or passed through. ................................. 43

    C.    The drugs entered the Western District of Virginia........... 52

III.    Purks's Statements Were Correctly Admitted. ........................... 53

    A.    Purks waived review of the district court's predicate fact-finding, and his legal arguments take only a "passing shot" at the issues. ................................. 53

    B.    Purks's statements were voluntary. .................................... 55

    C.    There was no *Miranda* problem. ......................................... 58

        1.  The district court did not clearly err by crediting Agent Hickey's testimony that Purks failed to invoke any rights he had............................................. 58

    2.  The interview was not "custodial" under *Miranda*........ 60

  D.    Any error was harmless...................................................... 64

CONCLUSION.................................................................................. 65

STATEMENT REGARDING ORAL ARGUMENT ............................... 65

CERTIFICATE OF COMPLIANCE ...................................................... 67

CERTIFICATE OF
SERVICE…………………………………………………………..…68

# TABLE OF AUTHORITIES

**Cases**

*Howes v. Fields*, 565 U.S. 499 (2012)....................... 27, 32, 61, 62, 63, 64

*United States v. Tingle*, 183 F.3d 719 (7th Cir. 1999) .................... 46, 51

*United States v. Anudu*, 77 F.3d 471, 1996 WL 67214 (4th Cir. 1996)................................................................. 45

*United States v. Arce*, 49 F.4th 382 (4th Cir. 2022)............................... 61

*United States v. Ashley*, 606 F.3d 135 (4th Cir. 2010).......................... 42

*United States v. Ayesh*, 702 F.3d 162 (4th Cir. 2012)..................... 29, 56

*United States v. Barronette*, 46 F.4th 177 (4th Cir. 2022).............. 30, 36

*United States v. Braxton*, 112 F.3d 777 (4th Cir. 1997) ................. 29, 56

*United States v. Broussard*, No. 3:16-CR-352, 2020 WL 3839643 (M.D. Pa. July 8, 2020)............................................. 48, 51

*United States v. Brunty*, 7701 F.2d 1375 (11th Cir. 1983) .............. 45, 46

*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996)........................... 42

*United States v. Conley*, 779 F.2d 970 (4th Cir. 1985).............. 62, 63, 64

*United States v. Copeland*, 707 F.3d 522 (4th Cir. 2013) ...................... 28

*United States v. Corona*, 34 F.3d 876 (9th Cir. 1994)........................... 47

*United States v. Cristobal*, 293 F.3d 134 (4th Cir. 2002)................ 32, 57

*United States v. Denton*, 944 F.3d 170 (4th Cir. 2019)......................... 42

*United States v. Doctor*, 958 F.3d 226 (4th Cir. 2020)......................... 60

*United States v. Fall*, 955 F.3d 363 (4th Cir. 2020).............................. 28

*United States v. Gray*, 137 F.3d 765 (4th Cir.1998) ............................ 58

*United States v. Gromet*, 801 F.2d 395, 1986 WL 17616 (4th Cir. 1986) (unpublished) .............................................. 45

*United States v. Hale*, No. 7:19-CR-004, 2023 WL 6465141, (W.D. Va. Oct. 2, 2023)............................................... 49

*United States v. Harris*, 995 F.2d 532 (4th Cir. 1993).......................... 59

*United States v. Holmes*, 670 F.3d 586 (4th Cir. 2012) ................... 32, 57

*United States v. Horsley*, 105 F.4th 193 (4th Cir. 2024) ........... 33, 64, 65

*United States v. Lartey*, 716 F.2d 955 (2d Cir. 1983) ............................ 47

*United States v. Leggette*, 57 F.4th 406 (4th Cir. 2023) ....................... 63

*United States v. McLean*, 715 F.3d 129 (4th Cir. 2013) ....................... 29

*United States v. Montalvo*, 959 F.2d 232, 1992 WL 64855
(4th Cir. 1992) (unpublished) ..................................... 31, 44, 45, 51

*United States v. Nunez*, 8 F.3d 822, 1993 WL 415219 (4th
Cir. 1993) (unpublished) .................................................. 31, 44, 45

*United States v. Powers*, 40 F.4th 129 (4th Cir. 2022) ........................ 49

*United States v. Riley*, 920 F.3d 200 (4th Cir. 2019) ............................ 61

*United States v. Rodriguez*, 518 F.3d 1072 (9th Cir. 2008) ................... 30

*United States v. Rowe*, 919 F.3d 752 (3d Cir. 2019) ............................. 47

*United States v. Savage*, 885 F.3d 212 (4th Cir. 2018) ........................ 35

*United States v. Seigler*, 990 F.3d 331 (4th Cir. 2021) ........ 30, 35, 38, 40

*United States v. Solis*, 299 F.3d 420 (5th Cir. 2002) ............................ 47

*United States v. Sterling*, 860 F.3d 233 (4th Cir. 2017) ....................... 29

*United States v. Stover*, 808 F.3d 991 (4th Cir. 2015) ........................... 29

*United States v. Taylor-Sanders*, 88 F.4th 516 (4th Cir. 2023). 32, 53, 55

*United States v. Tiangco*, 225 F. Supp. 3d 274 (D.N.J. 2016) .. 31, 47, 48,
51

*United States v. Umana*, 750 F.3d 320 (4th Cir. 2014) ......................... 51

*United States v. Villarini*, 238 F.3d 530 (4th Cir. 2001) ....................... 40

*United States v. Watkins*, 111 F.4th 300 (4th Cir. 2024) ................ 30, 34

*United States v. Williamson*, 706 F.3d 405 (4th Cir. 2013) ................... 58

**Statutes**

18 U.S.C. § 1959 ................................................................................. 51

18 U.S.C. § 3231.................................................................... 3

18 U.S.C. § 3237.......................................... 31, 43, 44, 45, 50

18 U.S.C. § 3742(a) ............................................................. 3

21 U.S.C. § 802.................................................. 41, 47, 50, 51

21 U.S.C. § 841.................................... 1, 3, 5, 31, 41, 44, 45, 48, 50, 51

21 U.S.C. § 846.................................................................... 4

28 U.S.C. § 1291.................................................................. 3

# INTRODUCTION

This is a criminal appeal from a trial of a drug conspiracy orchestrated from Florida prison to distribute drugs into the Western District of Virginia. Carlos Bariola (C-Lo or C-Low) and Stephen Purks were incarcerated together in Florida, and they used women in that state and Virginia to coordinate and facilitate their drug deals. One of those women was Natassia Kimble (Prima), who helped package and mail Bariola and Purks's drugs from her residence in Florida.

It is undisputed that C-Lo and Prima were members of the conspiracy. Substantial trial evidence demonstrated Bariola was C-Lo and Kimble was Prima, and thus their conspiracy convictions should be affirmed.

Purks challenges venue over 14 drug distribution counts premised on *Pinkerton* liability for his co-conspirators shipping drugs from Florida into the Western District of Virginia. Because distribution under 21 U.S.C. § 841 is a continuing offense and the drugs were delivered into the district (some when received by co-conspirator Catherine Rec, others when intercepted by law enforcement en route to her), the jury's finding of venue on those counts was proper.

Finally, Purks challenges the denial of a motion to suppress inculpatory statements he made to federal agents while he was in Florida state custody. The district court made detailed factual findings that Purks does not earnestly challenge, including a credibility finding that Purks never invoked his *Miranda* rights. In fact, Purks had no *Miranda* rights because, under the totality of the circumstances, he was not "in custody," as that term of art is legally defined. Moreover, the cordial—even playful—nature of the interview, investigators' calm demeanor, and other circumstances showed Purks's statements were voluntary.

Accordingly, the Court should affirm.

## STATEMENT OF JURISDICTION

These consolidated appeals stem from criminal convictions after a jury trial in the United States District Court for the Western District of Virginia in Harrisonburg. Entry of the district court's judgments against each Appellant was followed by a timely notice of appeal. JA2607–2616 (Bariola), JA2640–2648 (Purks), JA2670–2677 (Kimble).[1] The district

---

[1] "JA" refers to the Joint Appendix, "Br. at" refers to Appellant's Brief, and internal citations and quotations are generally omitted unless otherwise noted.

court had jurisdiction under 18 U.S.C. § 3231.  The Court of Appeals has jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether Bariola waived a sufficiency of the evidence claim by failing to move for acquittal after putting on evidence, and whether there was sufficient evidence for a reasonable jury to conclude Bariola and Kimble were the identities of those who went by aliases C-Lo and Prima in the methamphetamine conspiracy.

2.     Whether drug distribution under 21 U.S.C. § 841 is a continuing offense for venue purposes, and whether the evidence was sufficient for the jury to find venue, by a preponderance of the evidence, when drugs were mailed by a co-conspirator into the district of prosecution.

3.     Whether Purks's statements to agents were voluntary; if so, whether Purks was in custody for *Miranda* purposes and whether the district court clearly erred by finding he failed to invoke his right to counsel.  Whether any assumed error was harmless given overwhelming trial evidence.

## STATEMENT OF THE CASE

Carlos Bariola and Stephen Purks orchestrated an interstate methamphetamine distribution ring from Florida prison by utilizing several collaborators on the outside, like Natissa Kimble, to ship drugs through the U.S. Mail into the Western District of Virginia. A jury found the trio guilty of this methamphetamine conspiracy and Purks guilty of 14 distribution counts for drugs sent into the district by his co-conspirators, often directly at his behest.

### A. Charges in the Operative Indictment

In 2021, Bariola, Purks, and Kimble (collectively, "Appellants") were charged in a nine-defendant superseding indictment with conspiring to distribute, and to possess with intent to distribute, over 50 grams of actual methamphetamine and over 500 grams of a mixture or substance containing methamphetamine, under 21 U.S.C. § 846. Count 1 alleged an approximate date range for the conspiracy from about March 2020 to about April 2021. JA38–39.

Count 1 also included as defendants several co-conspirators who ultimately pled guilty and testified against Appellants at trial—Ashlyn Gates, Catherine Rec, Jessica Grote, April Mosley, and Stephanie Butler.

Their roles in the conspiracy are discussed below, but generally stated, they coordinated with Appellants and others to ensure drugs were mailed from Florida into the Western District of Virginia, and that payments were collected.

Additionally, Purks was charged as a co-defendant in 14 distribution-of-methamphetamine counts under 21 U.S.C. § 841. JA40–46. Counts 3 through 10 charged Purks with drug distributions in conjunction with Mosley from approximately October 30, 2020, through January 5, 2021. JA41–43. Counts 12 through 17 charged Purks with drug distributions in conjunction with Mosely or Grote (or both, depending on the count) between approximately January 13, 2021, and April 28, 2021. JA44–46.

## B. Trial Evidence

A joint trial of Appellants (along with a fourth co-defendant, Jacqueline Cuellar) was held. The evidence overwhelmingly established the existence of a methamphetamine conspiracy whereby Purks (sometimes called "City") and Bariola (usually referred to as "C-Lo" or "C-Low")—both incarcerated in a Florida prison—directed the packaging and shipping of drugs from Florida into the Western District of Virginia.

Kimble, who was known as "Prima," was one of the women who helped package and send the drugs from Florida.

## 1. Overview of the methamphetamine conspiracy

Law enforcement began investigating the conspiracy in the summer of 2020, when they identified an individual receiving methamphetamine "flown up" into the Winchester, Virginia area. JA338. U.S. Postal Inspector John Chavez flagged suspicious addresses, and a controlled purchase of drugs from Ashlyn Gates was executed. JA340, JA728–734. Investigators then worked to identify higher members in the conspiracy.

Social media search warrants and further investigation led authorities to Catherine Rec, who was based out of Middletown, in the Western District of Virginia. JA346–347, JA581. Rec was observed receiving several packages of methamphetamine, and a search warrant of her residence was executed in January 2021. JA348–350. Several of these shipments formed the basis of Counts 3 through 10 against Purks.

The search of Rec's residence revealed currency, a digital scale, and plastic baggies (all materials consistent with drug distribution), and Rec agreed to serve as a confidential informant while also providing officers with access to her text messages and cellphone. JA352–354. After the

January 2021 search warrant, agents used Rec to arrange purchases of methamphetamine from Florida, for which government funds were provided in exchange for drugs; the resulting shipments were intercepted at a local post office and formed the basis of Count 12 through 17 against Purks. JA355–356. At that juncture, the investigation entered the follow-the-money stage to ascertain additional conspirators.

Drug money first flowed through April Mosley and Jessica Grote. JA358–359. Using Rec as a confidential source, law enforcement made multiple controlled purchases, typically in coordination with Mosley and Grote. *E.g.*, JA360–374. Mosley operated out of Florida, as did Grote. JA592–593, JA1241, JA1243.

In text messages with Rec, Mosley indicated that she was waiting on directions from someone in "the box" (solitary confinement), who turned out to be Purks ("City"). JA384, JA388, JA1244, JA1419; *see also* JA408, JA401 ("Stephen is in confinement again."). Mosley testified at length about working with Purks through Facebook, contraband cellphones, and the prison email system called "JPay" to facilitate Purks's drug deals while he was incarcerated. *E.g.*, JA594–599, JA603, JA607, JA2333 (Ex. 529). Their coordination was "pretty regular," and payments

were "prearranged" through Purks. JA609, JA611. Sometimes, Mosley coordinated with and sent drug proceeds to co-defendant Jackie Cuellar, who handled the money for C-Lo. JA654, JA681.

But Purks was not the ultimate shot-caller. That was C-Lo, who was the boss and "partners" with Purks. JA1250, JA1450, JA1453. Purks himself admitted to co-conspirators that he had to coordinate with C-Lo for certain drug deals, and Purks further directed payments to C-Lo. JA608, JA611, JA615.

But by and large, Purks ran the day-to-day operation of the conspiracy. For instance, like Mosley, Grote communicated regularly with Purks from jail via Facebook, JPay, and cellphones. JA1245. Grote—who loved Purks—obtained drugs from Mosley at Purks's direction. JA1246–1248. Grote and Mosley had something of a romantic rivalry over Purks, which at times Grote tried to smooth over because Purks needed Mosley to continue shipping methamphetamine for him. JA1248–1249. Grote sometimes supplied Rec and Butler in Virginia to try to displace Mosley, because she wanted Purks to depend on her rather than Mosley. JA1259.

Grote explained that C-Lo was Purks's boss, based on the way she

heard the men converse, with Purks asking C-Lo for permission to buy drugs. JA1249–1250. Grote testified that C-Lo was a male who was also in Florida prison with Purks. JA1250. C-Lo was essentially Purks's supplier. JA1253.

Before her cooperation with the Government, Rec had dealt directly with Purks after Mosley and Grote had a falling-out with Purks. JA391, JA540, JA652–653, JA2014–2015 (Ex. 204), JA1026–1028. Rec began receiving methamphetamine by mail from Purks. JA1030. Rec explained she was formerly friends with co-conspirator Gates, and the two used methamphetamine together. JA1015–1017. Gates and Butler had approached Rec about selling methamphetamine to make money, and Rec—who had a child with special needs and needed the money—agreed. JA1019–1020.

Stephanie Butler also testified against Appellants. She too interfaced with Purks as part of the drug conspiracy. *E.g.*, JA977. They spoke and messaged almost every day. JA978. Purks admitted to her he was in a Florida jail. JA979. To feed her own drug habit and make money, Butler agreed to receive and distribute packages of methamphetamine that Purks orchestrated from jail—Purks told her where and how much

money to send, and who to send it to (Mosley and Grote). *E.g.*, JA982–984. Purks also directed Butler to work through Mosley and Grote when Purks was unavailable in prison. JA984–985. Eventually, Butler started obtaining methamphetamine from Rec. JA988.

Gates—Butler's friend in Winchester area, JA1415, JA1417—testified as well. Gates explained she obtained methamphetamine from Butler, who was supplied by Purks. JA1418. Eventually, Gates also obtained methamphetamine directly from Purks because "it was cheaper to cut out the middleman." JA1421. Gates coordinated her deals with Purks via video and JPay messages, among other media. JA1422. Mosley shipped Gates the packages from Purks, and Gates sent Mosley her money. JA1427. At times the methamphetamine packages were mailed to Gates in the Winchester area, and sometimes she used friends' addresses. JA1430–1432. Gates eventually introduced Rec to Purks. JA1433. Gates also obtained drugs through "Prima," whose cellphone number she obtained from Jackie Cuellar. JA1440–1443.

Based on information from the controlled purchases (such as tracking numbers) and cross-referencing it against U.S. Postal Service data, investigators were typically able to identify the post office store,

counter, time, and identity of the sender in Florida who shipped the drugs into Virginia and elsewhere. JA728–734.

At trial, Purks's statements from an interview were introduced, in which he admitted "ice is my money" and identified Rec and Butler as some of his methamphetamine customers. JA1324.

Notebooks were seized from Cuellar's home documenting financial transactions and using the names C-Low and Prima. JA1309–1314, JA2084–2087 (Ex. 350), JA2112 (Ex. 352). Voluminous documentary evidence was introduced and discussed, including text messages, emails, and social media messages proving the conspiracy and corroborating the cooperating witnesses.

In sum, C-Lo and Purks led the drug conspiracy from prison, using Mosley and Grote to coordinate and further distribute the methamphetamine to Stephanie Butler and Catherine Rec (both of whom were in the Western District of Virginia) and others, such as Gates. JA610. Co-defendant Cuellar assisted this endeavor and largely handled the conspiracy's money. And, as detailed below, Prima (that is, Appellant Kimble) packaged and shipped drugs.

## 2. Evidence of Bariola's identity

One issue at trial was whether Bariola was in fact the co-conspirator known as C-Lo (or C-Low). A host of evidence—direct and circumstantial—proved Bariola was that person.[2]

First, co-conspirator Gates gave direct testimony at trial that Bariola was C-Lo, a fact she learned directly from Purks. JA1447–1448. Bariola conceded to the jury in closing argument that "one witness for the government, Ms. Gates, said that C-Low was Bariola." JA1645.

Second, Bariola stipulated at trial that he had a "C Low" tattoo on his right shoulder, and the tattoo was shown to the jury. JA713–715.

Third, in August 2020, Gates communicated directly with "Carlos Bariola" via JPay, wherein Bariola referred to Jackie (Cuellar), and Gates contemporaneously described the exchange to Rec as with C-Lo ("c lo reached out to me on jpay"). JA1457, JA2274–2276 (Ex. 504).

Fourth, Bariola gave his full name to co-conspirator (and girlfriend, JA680) Jackie Cuellar, as her text messages showed.

---

[2]     To the extent Bariola's argument is that nothing proved the man on trial was in fact Carlos Bariola, Special Agent Hickey made an in-court identification of Bariola to the jury. JA1338, JA1342.

| ENGLISH |
|---|
| BABY, DO YOU HAVE YOUR MIDDLE NAME ON YOUR SOCIAL? |
| CARLOS ENRIQUE BARIOLA |

JA 2183, JA1363–1364; *accord* JA2174.

Fifth, Bariola's Florida prison records showed he was known by the moniker "CLO" and "CEE LOW." JA1704, JA2269.

There was also circumstantial evidence showing Bariola was C-Lo.

- <u>Same birthday</u>. C-Lo's birthday was in Mosley's phone based on when Jackie Cuellar said it was. JA654, JA2292 (Ex. 523, line 12). Prison records confirmed that date was also Bariola's birthday. JA1704, JA2266 (redacted), SA2945 (unredacted Ex. 493).

- <u>Same prison</u>. Purks and C-Lo had at various times, according to co-conspirators, been incarcerated together. JA650, JA1250, JA1451. Prison records showed Bariola and Purks were incarcerated together at the Columbia prison in fall 2018 and the Walton prison from summer 2019 through May 2020. JA1737 (summation), JA1321–1322, JA1337, JA2251–2253 (Purks records), JA2267–2268 (Bariola records); *see also* JA649–650 (testimony about C-Lo in Florida prison and on JPay).

- <u>Same Cuban heritage</u>. Mosley and Purks stated C-Lo was Cuban. JA645. Bariola's prison records showed he was born in Cuba. JA2270.

### 3. Evidence of Kimble's identity

Kimble also contested her identity as co-conspirator Prima. Several

pieces of evidence showed that Kimble was Prima, and in any event she was directly connected with the conspiracy.

The phone number for Prima in co-conspirator Cuellar's cellphone – (305) 898-5267 – was saved as "Nathasia," registered to Kimble as the billing party, and listed her address in Hialeah, Florida.  JA1370–1375 (testimony summarizing texts and obtaining phone contract), JA2178 (Purks texting Cuellar the -5267 number in response to "U GOT PRIMA NUM?"), JA2753–2760 (examples of Cuellar coordination with -5267 number saved as "Nathasia," who was referred to as "Prima" in substantive texts), JA2773 (subscriber information for -5267 number listing "NATASSIA KIMBLE" as billing party with address in Hialeah, Florida).

The Hialeah address connecting Prima's phone number to Kimble was Kimble's home address, where officers arrested her.  JA1106–1107. Evidence in the investigation identified Hialeah as a city from which several of the packages had been mailed.  *E.g.*, JA728, JA733, JA763, JA786–787 JA765, JA2777. Upon her arrest, Kimble initially consented to a search of her room, but revoked consent just as officers located a cellphone. JA1108–1109. Agents later obtained a search warrant for

Kimble's room, where they found a variety of packaging, sealing, and shipping materials, including: black electrical tape[3], clear tape, staplers, glue, U.S. Postal Service envelopes with preprinted labels and tracking numbers, and other items. JA1110–1123, *e.g.*, JA2246–2250 (photos of seized packing and mailing supplies), JA2768–2770 (photos of shipping packages). Multiple envelopes were addressed to Kimble. JA1114–1115, JA2769, JA2771. There were paper and shipping "envelopes all over." JA1173.

One of the shipping envelopes inside Kimble's home noted it was from Jacqueline T. Cuellar.



JA1115–1116, JA2770. Agents also seized a paper in Kimble's apartment with Catherine Rec's name and Middleton, Virginia address on it. JA1116–1117, JA2772. Agents located 25 T-Mobile sim cards and small

---

[3]     At least one seized packaged used black tape. *E.g.*, JA826.

plastic ziplock baggies commonly used for repackaging narcotics for street distribution. JA1123–1134.

In other text messages from C-Lo (Bariola) coordinating drug deals and payments, C-Lo specifically gave Kimble's name ("Nastasia") and street address. JA2196, JA2199.

In addition, other circumstantial evidence corroborated the above evidence connecting Kimble to the conspiracy. For instance, co-conspirators testified that Prima lived in the Miami, Florida area, JA1251–1252 (Grote) and was female, JA1441 (Gates), descriptions that both fit Kimble.

The district court denied Kimble's mid-trial motion for acquittal. It reasoned:

> [G]iven the phone record with her name, given the items in that room, which she had the key to, led them to, opened the door, and given those items in the room, some of which connect her with this conspiracy, I think a reasonable jury could find -- I find that a reasonable jury could find against [Kimble.]

JA1654–1655. In closing, the Government touched upon several of these facts for the jury and walked it through why Kimble was Prima. JA1738–1741.

#### 4. The 14 distribution counts against Purks

The jury also convicted Purks of 14 distributions (counts 3–10, 12–17) that were accomplished when co-conspirators Mosely or Grote mailed drugs into the Western District of Virginia as part of the conspiracy. The jury was instructed on *Pinkerton* liability—*i.e.*, if it found Purks was a member of the conspiracy "and another member of that conspiracy did distribute methamphetamine," then the jury could find Purks guilty of that distribution. JA1833, JA1842–1843.

The charged distributions were drugs directed to co-conspirators Catherine Rec's Middleton, Virginia address, located in the Western District of Virginia. *E.g.*, JA677 (coordinating shipment to Rec's address), JA2804 (Ex. 526), JA784–785 (Rec's address). Some were delivered all the way to Rec's home, and the remaining shipments were intercepted at a post office in the district.

Counts 3 through 10 were drug shipments received at Rec's home while she was an active co-conspirator. The drugs comprising Count 10 were also seized at Rec's home during the January 2021 search warrant. Counts 12 through 17 were shipments sent to Rec's address while she was a government cooperator and were intercepted at the Stephens City,

Virginia post office in the Western District of Virginia. JA818–819, JA821–823. In sum, venue for Counts 3 through 10 was based on drugs coming to Rec's home during the course of the conspiracy, Count 10 was actually seized at Rec's home, and Counts 12 through 17 were seized at a post office within the district while they were in route to Rec's home.

The following chart is a summary for each distribution count, its date as alleged in the indictment, the location in the Western District of Virginia the drugs were delivered to, the location in the Western District of Virginia where the drugs were seized (if applicable), the parcel tracking number (terminal 3 digits), and additional citations to testimony Postal Inspector Chavez about each parcel.

| Count | Date alleged | WDVA location (received) | WDVA location (seized) | Track. # | Testimony |
|---|---|---|---|---|---|
| 3 | 10/30/20 | Rec's address | n/a | -642 | JA760 |
| 4 | 12/2/20 | Rec's address | n/a | -129 | JA770 |
| 5 | 12/7/20 | Rec's address | n/a | -069 | JA771–772 |
| 6 | 12/11/20 | Rec's address | n/a | -202 | JA773–776 |
| 7 | 12/17/20 | Rec's | n/a | -012 | JA776–777 |

| | | | | | |
|---|---|---|---|---|---|
| | | address | | | |
| 8 | 12/18/20 | Rec's address | n/a | -956 | JA778–779 |
| 9 | 12/28/20 | Rec's address | n/a | -194 | JA779–781 |
| 10 | 1/5/21 | Rec's address | Rec's address | -573 | JA818–822 |
| 12 | 1/13/21 | Addressed to Rec but intercepted | Stephens City post office | -538 | JA822–826 |
| 13 | 3/25/21 | Addressed to Rec but intercepted | Stephens City post office | -146 | JA833–839 |
| 14 | 3/31/21 | Addressed to Rec but intercepted | Stephens City post office | -357 | JA839–842 |
| 15 | 4/12/21 | Addressed to Rec but intercepted | Stephens City post office | -414 | JA843–845 |
| 16 | 4/16/21 | Addressed to Rec but intercepted | Stephens City post office | -778 | JA845–850 |
| 17 | 4/28/21 | Addressed to Rec but intercepted | Stephens City post office | -166 | JA850–852. |

At trial, the Government introduced Exhibit 521, showing distributions during the conspiracy, including the charged ones. JA720–721, JA2777. The chart listed the date mailed, tracking number, location

mailed from, location mailed to, media documentation method such as picture or video (P, V), and whether the drugs were seized.[4]

Counts 3, 4, 5, and 6 corresponded to the following lines of Exhibit 521:

| October 28, 2020 | EJ 462 495 642 US | Jacksonville Main Post Office Jacksonville, FL 32203 | | P | No |
|---|---|---|---|---|---|

| December 1, 2020 | EJ 467 501 129 US | Jacksonville Main Post Office Jacksonville, FL 32203 | | V, P | No |
|---|---|---|---|---|---|
| December 5, 2020 | EJ 571 576 069 US | Jacksonville Main Post Office Jacksonville, FL 32203 | | V, P | No |
| December 10, 2020 | EJ 438 380 202 US | Jacksonville Main Post Office Jacksonville, FL 32203 | | V, P | No |

Counts 7, 8, and 9 corresponded to these lines of the exhibit:

| December 11, 2020 | EJ 438 375 012 US | Jacksonville Main Post Office Jacksonville, FL 32203 | | V, P | No |
|---|---|---|---|---|---|

| December 18, 2020 | EM 007 413 956 US | Lake Forest Station Jacksonville, FL 32208 | | P | No |
|---|---|---|---|---|---|
| December 26, 2020 | EJ 194 862 194 US | Jacksonville Main Post Office Jacksonville, FL 32203 | | V, P | No |

This line was Count 9:

| December 26, 2020 | EJ 194 862 194 US | Jacksonville Main Post Office Jacksonville, FL 32203 | | V, P | No |
|---|---|---|---|---|---|

And, excluding the January 23 and March 15 mailings (which were not charged counts), the following lines corresponded to Counts 10 and

---

[4]  Due to shipping times, the mailing date in Exhibit 521 is generally a few days before the drugs entered the Western District of Virginia and thus a few days before the dates alleged in the indictment, which included "on or about" language. JA40–46. The jury was instructed the Government need only prove the crimes happened "reasonably near the date alleged." JA1827.

12 through 17.

| | | | | | |
|---|---|---|---|---|---|
| January 2, 2021 | EJ 566 549 573 US | Jacksonville Main Post Office Jacksonville, FL 32203 | | V, P | Yes |
| January 12, 2021 | EJ 580 499 538 US | Lake Forest Station Jacksonville, FL 32208 | | P | Yes |
| January 23, 2021 | EJ 409 014 983 US | Mesa Mountain View Mesa, AZ 85213 | | P | Yes |
| March 15, 2021 | 9505 5156 3289 1074 1106 28 | South Creek Post Office Orlando, FL 32837 | | V | Yes |
| March 23, 2021 | EJ 405 709 146 US | Miami, FL 33152 | | S | Yes |
| March 30, 2021 | EJ 349 341 357 US | Miami, FL 33152 | | S | Yes |
| April 9, 2021 | EJ 349 341 414 US | Miami, FL 33152 | | S | Yes |
| April 14, 2021 | EJ 579 564 778 US | Miami, FL 33152 | | S | Yes |
| April 26, 2021 | EJ 326 605 166 US | Homestead, FL 33032 | | S | Yes |

JA2777.

Purks moved for judgment of acquittal on the theory that venue over the distribution counts was improper in the Western District of Virginia. JA1632–1637. The district court denied the motion for acquittal, based on Fourth Circuit and other authority that distribution is a continuing offense, over which venue exists in a district into which the drugs were sent. JA1683–1686.

### C. Suppression Litigation over Purks's Interview

Pretrial, Purks unsuccessfully moved to suppress statements he made to federal officers while incarcerated in Florida state prison.

#### 1. The suppression briefs

Purks alleged his statements to federal officers were involuntary

because they were supposedly the product of coercion based on an alleged beating he received from state prison officials two days before the interview. JA2615–2617. He also asserted a *Miranda* violation for impermissible custodial interrogation after he invoked his right to counsel. JA2617–2618.

In response, the Government observed the interrogation was not custodial within the meaning of *Miranda* because, under controlling Supreme Court precedent, removal from the general prison population to ask about crimes is not custodial for Fifth Amendment purposes. JA2622–2624. Additionally, the Government pointed out there was no evidence (besides Purks's allegations) that state prison officials beat Purks. Moreover, he was provided *Miranda* warnings, the agents behaved professionally throughout the interview, Purks did not ask for a lawyer, and Purks was relaxed during the interview. JA2624–2626.

## 2. Evidence at the suppression hearing

At an evidentiary hearing, Purks conceded he was *Mirandized* and that the "factual" question was whether the interrogation was "custodial" (as that term is legally defined), given that Purks was already incarcerated on unrelated state charges when he gave the interview.

JA68–69. He forthrightly acknowledged that the fact of incarceration alone could not make the interrogation custodial, JA71, JA152, which is a precondition for the application of *Miranda.*

DEA Special Agent Thomas Hickey testified. JA86. In May 2021, Agent Hickey and two other investigators traveled to Florida to interview Purks, who at that time had been indicted in the Western District of Virginia. JA88–89. Purks was incarcerated in a Florida state prison (called an "Annex"). JA89. Before the visit, Agent Hickey learned Purks concealed a cellphone in his anus at the prison and asked prison officials to obtain it. JA90–91, JA112.

When Agent Hickey arrived, he first met with a Florida prison investigator, who provided a separate "office space" in the "admin[istrative] area" of the prison for the interview. JA91–92. The office had no cameras and no observational windows; it was simply an office. JA92–93. Purks was escorted into the room in a wheelchair, and the prison guards closed the door behind him, leaving Purks, Hickey, and Hickey's two colleagues inside. JA93, JA102; *see* JA 114 (door was not locked inside). Agent Hickey did not observe any physical abnormalities or injuries to Purks, other than his slightly slumped posture. JA93–94.

Agent Hickey shook Purks's hand, introduced himself and his colleagues, advised Purks he was indicted in Virginia and of the charges against him, informed Purks that Agent Hickey had obtained the anal phone, and explained Purks was not under arrest that day but would eventually be writ-ed over to federal custody. JA94–95.

The conversation at this juncture was "very professional"—a "back-and-forth kind of talk" about what the charges in Virginia were, with Purks denying involving in methamphetamine trafficking. JA95–96. Agent Hickey then informed Purks that agents "have your Facebook," had "seen you, you know, send pictures of methamphetamine," and "were purchasing methamphetamine being arranged through" Purks. JA96. Purks then started "laughing and saying, Okay, you got me, kind of thing" and the two men "were joking back and forth" about it. JA96–97. During these interactions, none of the officers present possessed firearms, threatened Purks, yelled at him, or touched him; rather, it was a "cordial conversation." JA97–98.

At that point, Agent Hickey then *Mirandized* Purks using a standard DEA *Miranda* card, reading each sentence and confirming that Purks understood. JA98–101. Post-*Miranda*, Purks admitted the anal

phone was his, but alleged that Florida prison guards had beaten him when they took it. JA102–103. He explained he was trying to call Jessica Grote at the time the guards found the phone. JA103.

The conversation turned to other co-conspirators. JA103. Purks would not talk about most of the females he worked with, but did discuss Bariola, as well as Kimble. JA104. Purks never asked for a lawyer or to stop the interview. JA104. Throughout, Purks's demeanor was "very cordial, very respectful," "kind of giddy," "very impressed with himself," laughing, and smiling. JA104–105. Purks expressed he wanted to cooperate with the Government, and the conversation was "respectful." JA105–106. At one point, when Purks grimaced in his wheelchair, Agent Hickey inquired about his physical condition, and Purks indicated he was alright. JA107. At the conclusion of the interview, Purks and Agent Hickey shook hands, Purks expressed a willingness to continue cooperating, and prison officials returned to take Purks back to his cell.

JA108.[5]  Prison officials then provided Agent Hickey with Purks's anal phone.  JA109.

Purks testified next.  He claimed Florida prison officials beat him to obtain his anal phone.  JA120. He was in solitary confinement at the time he was taken to the office to meet Agent Hickey. JA121. Purks admitted his interview "wasn't no disrespectful things, or us yelling back and forth at each other or nothing like that." JA122. Purks acknowledged the encounter was not threatening and that he was read a *Miranda* warning by Agent Hickey.  JA127, JA138.

Purks did claim—in contradiction to Agent Hickey's testimony— that Purks asked for a lawyer after being *Mirandized*. JA123, JA126. He also admitted he had at least five prior felony drug and gun convictions. JA128–130. Purks further acknowledged that, when Florida prison officials confiscated his anal phone, he initially lied to them by falsely denying he had it. JA140–141. And he confirmed that, prior to the

---

[5]    Agent Hickey took notes of the interview but was unsure if he provided them to the U.S. Attorney's Office. JA116. After trial and sentencing, Agent Hickey discovered the notes, which the Government then provided to Purks's counsel in an abundance of caution and invited a meet-and-confer session, if desired.  To the undersigned's knowledge, Purks did not respond.

interview in the office, he was housed in solitary confinement. JA131.

Purks acknowledged: the agents were respectful, friendly, and non-threatening during the interview; they did not yell; he "may have been, you know, a smart aleck," and; he did not see any weapons on the officers. JA132–134, JA140, JA145.

### 3. The district court's factual findings and ruling

The district court denied the motion. JA2629–2639.

It rejected Purks's *Miranda* argument for two reasons. First, the court found "Purks was not in custody for purposes of *Miranda*" based on an analogous Supreme Court case of *Howes v. Fields*. JA2635. The court noted it was undisputed there was no physical restraint of or threats against Purks by the federal agents, and in fact their tone was "by and large respectful." JA2636. Second, the court also "credit[ed]" Agent Hickey's "unequivocal testimony that Purks never asked for a lawyer over Purks'[s] testimony that he did invoke a right to counsel." JA2637. The court believed Agent Hickey's testimony and disbelieved Purks's testimony, which had been impeached by his hiding the cellphone in the first place and by his five prior felony convictions. JA2637.

Turning to Purks's involuntariness claim, the court found the

totality of the circumstances showed a conversation that was "voluntary, respectful, and at times even friendly." JA2637. Purks was no neophyte to the criminal process, given his criminal history. He agreed he was willing to answer questions. He was given a *Miranda* warning and indicated he understood. And agents did not touch, yell at, or threaten him. Purks exuded a relaxed demeanor, variously "laughing and smiling" and being "smart alecky" with agents—"hardly consistent with someone" who felt his will was being overborn by agents. JA2638. Additionally, even if it was true that Florida prison officials beat Purks two days before the interview, the "record did not support a finding that federal agents" engaged in that activity or that they "even knew Purks was allegedly beaten until he told them at the interview." JA2638–2639.

***

Appellants appealed after entry of judgment on their sentences.

## STANDARDS OF REVIEW

**I**.    Whether a party waives an issue is reviewed *de novo*, as is (when properly preserved) whether substantial evidence supports the verdict. *See United States v. Fall*, 955 F.3d 363, 374 (4th Cir. 2020); *United States v. Copeland*, 707 F.3d 522, 528 (4th Cir. 2013); *United*

28

*States v. McLean*, 715 F.3d 129, 137 (4th Cir. 2013).

**II**.    A jury's venue finding is upheld "if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found venue by a preponderance of the evidence." *United States v. Sterling*, 860 F.3d 233, 241 (4th Cir. 2017).

**III**.    Regarding the denial of a motion to suppress, factual findings are reviewed for clear error, legal conclusions are reviewed *de novo*, and the evidence is reviewed in the light most favorable to the government. *United States v. Stover*, 808 F.3d 991, 994 (4th Cir. 2015).

The voluntariness of a statement is assessed based on "the totality of the circumstances," *United States v. Ayesh*, 702 F.3d 162, 168 (4th Cir. 2012), with the appellate court making an "independent determination on the issue of voluntariness," while accepting "the district court's findings of fact on the circumstances surrounding the confession unless clearly erroneous." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997). Similarly, whether a defendant was "in custody" for *Miranda* purposes is "a fact-specific, objective inquiry into the totality of the circumstances." *United States v. Arce*, 49 F.4th 382, 389 (4th Cir. 2022). Whether a defendant made a statement to invoke his *Miranda* rights is

a factual finding reviewed for clear error. *United States v. Rodriguez*, 518 F.3d 1072, 1076 (9th Cir. 2008).

## SUMMARY OF ARGUMENT

**I.** Bariola failed to preserve his sufficiency argument because, after putting on evidence, he failed to move for acquittal at either the close of evidence or after trial. His claim is therefore waived unless there is a manifest injustice, which there is not. *United States v. Watkins*, 111 F.4th 300, 307 (4th Cir. 2024).

Once a conspiracy has been proven, only a slight connection to it suffices to establish guilt. *United States v. Seigler*, 990 F.3d 331, 337 (4th Cir. 2021). Abundant evidence revealed that C-Lo and Prima—both undisputedly members of the charged conspiracy—were in fact Bariola and Kimble. One co-conspirator identified Bariola as C-Lo, and that alone was enough. *United States v. Barronette*, 46 F.4th 177, 205 (4th Cir. 2022). Email and text messages communications also proved Bariola's identity, as did the "C-Low" tattoo on his arm, along with corroborating evidence such as prison records show his nicknames were "CLO" and "CLOW" and that his prison stints overlapped with Purks.

As for Kimble, co-conspirators' text messages directly connected

"Prima" with the phone number registered to Kimble as the billing party and listing her home address. Further, Kimble's home contained a variety of shipping and drug paraphernalia, plus one parcel from co-conspirator Cuellar and paper listing the name and address of Virginia co-conspirator Rec. That and additional corroborating evidence was sufficient for a reasonable jury to ascertain Kimble's membership in the conspiracy.

II.     Sufficient evidence existed to support the jury's venue finding on the 14 distribution charges against Purks. Drug distribution under 21 U.S.C. § 841 is a continuing offense under 18 U.S.C. § 3237(a). *United States v. Montalvo*, 959 F.2d 232, 1992 WL 64855 (4th Cir. 1992) (unpublished); *United States v. Nunez*, 8 F.3d 822, 1993 WL 415219 (4th Cir. 1993) (unpublished). Accordingly, venue lies both where a defendant starts the delivery and wherever the delivery process continues, such as wherever the drugs pass through, are received, or are intercepted— including when they are sent by mail or couriered into a district. *E.g.*, *Montalvo*, 959 F.2d 232; *United States v. Tiangco*, 225 F. Supp. 3d 274, 279, 283–86 & n.15 (D.N.J. 2016). Here, there was a preponderance of evidence that the drugs underlying each of the 14 distributions were

delivered into the Western District of Virginia, either to a co-conspirator's home or to a local post office where they were intercepted.

**III.** The district court did not err in denying Purks's motion to suppress his statements. Purks's opening brief waived his suppression arguments by failing to take more than a passing shot at the issues or challenge the district court's fact-finding. *See United States v. Taylor-Sanders*, 88 F.4th 516, 525 n.5 (4th Cir. 2023).

Regardless, Purks's statements were voluntary, given: the interview was "respectful" and "friendly"; Purks had a relaxed and at times jocular demeanor; he said he felt fine physically; he was well-acquainted with the legal system and agreed to the interview after receiving a *Miranda* warning, and; agents did not threaten or touch him and were unarmed. *See United States v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002); *United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012). For similar reasons, Purks was also not "in custody" for *Miranda* purposes, as the district court correctly found when analogizing this case to *Howes v. Fields*, 565 U.S. 499, 590–12 (2012). The office space in which Purks was interviewed was a less restrictive environment than his default conditions in solitary confinement. But regardless, the district

court made a credibility determination that Purks never invoked his *Miranda* rights (which he conceded were read to him), so even if he was in custody, there was no *Miranda* violation.

Finally, overwhelming other evidence and the minimal significance of Purks's statements at trial rendered any error harmless. *United States v. Horsley*, 105 F.4th 193, 216–17 (4th Cir. 2024).

## ARGUMENT

## I. Bariola and Kimble Were Part of the Drug Conspiracy.

The record provided a substantial basis for a reasonable jury to conclude Bariola and Kimble were part of the drug conspiracy. It is undisputed the conspiracy existed and that C-Lo and Prima were members of it. Ample evidence demonstrated the last remaining links in the chain: That Bariola and Kimble were those personas.

### A. Bariola waived sufficiency review by failing to renew his motion after putting on evidence.

As a threshold matter, Bariola did not preserve his sufficiency claim when he failed to renew his Rule 29 motion for acquittal after putting on evidence.

"When a defendant moves for a judgment of acquittal after the prosecution rests and then proceeds to present evidence at trial, he must

33

later renew the motion to preserve appellate review. That is because, by introducing evidence, the defendant waives his objections to the denial of his motion to acquit." *United States v. Watkins*, 111 F.4th 300, 307 (4th Cir. 2024). "Thus, a defendant who moved for acquittal at the close of the prosecution's case, was denied, and then introduced his own evidence must move for acquittal again to preserve his challenge to the sufficiency of the evidence." *Id.*

Bariola made a Rule 29(a) motion on identity grounds after the Government's case-in-chief. JA1644–1646. After the court immediately denied the motion, Bariola put on evidence. JA1647, JA1694–1700. Hence, "by introducing evidence," he waived "his objections to the denial of his motion to acquit," and he needed to "move for acquittal again to preserve his challenge to the sufficiency of the evidence." *Watkins*, 111 F. 4th at 307. Bariola failed to do so. He did not move to acquit either after the close of all the evidence, *see* JA1711–1712, or after the verdict. *See* JA25 (docket sheet reflecting no motion for acquittal). Accordingly, he waived sufficiency review.

### B. Substantial evidence proved Bariola and Kimble were members of the conspiracy.

The evidence at trial demonstrated that both Bariola (C-Lo or C-

Low) and Kimble (Prima) were members of the drug conspiracy. Because it is unchallenged now that a conspiracy existed and that people known as C-Lo and Prima were part of it, the record need only show that a reasonable juror—taking the evidence and inferences in the Government's favor—could have found Bariola and Kimble were, respectively, those people.

The evidence in a sufficiency challenge is taken "in the light most favorable to the government." *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018). The Government receives "the benefit of all reasonable inferences from the facts proven to those sought to be established." *Id.* at 219–20. Even on *de novo* review, a "defendant who brings a sufficiency challenge bears a heavy burden, as appellate reversal on grounds of insufficient evidence is confined to cases where the prosecution's failure is clear." *Id.* at 219.

This Court has "long recognized" that drug conspiracies "are usually proven inferentially and by circumstantial evidence," and "upon establishing the conspiracy, only a slight connection need be made linking a defendant to the conspiracy to support a conspiracy conviction…". *United States v. Seigler*, 990 F.3d 331, 337 (4th Cir. 2021).

Here, there was a more-than-slight connection showing that Bariola and Kimble were connected to the conspiracy.

### 1. Bariola was C-Lo.

Substantial evidence provided the jury ample basis to conclude Bariola was C-Lo.[6]

The direct evidence alone sustained the conviction. For one, co-conspirator Gates testified that Bariola was, in fact, C-Lo. JA1447–1448. Bariola acknowledged that testimony in closing. JA1645. And that testimony was enough because even "the uncorroborated testimony of one witness" can "be sufficient evidence to sustain a conviction." *United States v. Barronette*, 46 F.4th 177, 205 (4th Cir. 2022). "But here, the testimony was indeed corroborated" by a litany of other evidence. *See id.*

For example, the jury saw with its own eyes Bariola's "C-Low" tattoo on his arm and heard with its own ears his stipulation to that fact. JA713–715. Email communications via JPay from August 2020 between Gates and "Carlos Bariola" also confirmed his identity, revealing direct evidence of his name and indirect evidence through Bariola's reference to

---

[6]     To the extent Bariola's argument is that nothing proved the man on trial was in fact Carlos Bariola, Agent Hickey made an in-court identification of Bariola to the jury. JA1338, JA1342.

another co-conspirator, Jackie. In a text message from the same time referring to the JPay message from "Carlos Bariola," Gates called Bariola "c lo." JA1457, JA2274–2276 (Ex. 504). Further, Bariola himself sent his full legal name to co-conspirator Jackie Cuellar when she was arranging payments. JA2183, JA1363–1364; *accord* JA2174. What's more, Bariola's prison records showed he went by the phonetically identical aliases: CLO and CEE LOW. JA1704, JA2269.

That all amounted to overwhelming evidence of Bariola's identity and thus membership in the conspiracy. To top it off, there was circumstantial evidence for a jury to infer Bariola was C-Lo: C-Lo (per Mosley's phone) and Bariola (per prison records) had the same birthdate, JA1704, JA2266 (redacted), SA2945 (unredacted Ex. 493); C-Lo and Bariola were both incarcerated in some of the same prisons at the same time as Purks, JA1321–1322, JA1337, JA2251–2253, JA2267–2268, JA649–650; and both C-Lo and Bariola were Cuban. JA645, JA2270. The evidence sufficed to show Bariola was a part of the conspiracy.

Bariola's contrary suggestions are, fundamentally, mere jury arguments seeking to reweigh evidence (by attacking the credibility of witnesses the jury found credible), which this Court will not do. *See*

*Seigler*, 990 F.3d at 337–38. Bariola made those arguments and others to the jury, and the jury rejected them.

### 2. Kimble was Prima and was otherwise part of the conspiracy.

Kimble likewise was proven to be a member of the conspiracy. While the quantum of evidence against her was not quite as weighty as against Bariola, what matters is "the sufficiency of the evidence that *is* in the record rather than [] what other evidence there *could* be." *Seigler*, 990 F.3d at 338 (emphasis in original).

First, text messages and cellphone subscriber information directly established that Kimble was the co-conspirator known as Prima. Co-defendant Cuellar coordinated the conspiracy with someone using the cellphone number (305) 898-5267, which Cuellar saved in her phone "Nathasia," phonetically similar to Kimble's first name. Cuellar obtained that -5267 number directly from "City" (that is, Purks), who provided it when Cuellar asked for Prima's number ("U GOT PRIMA NUM?"). And to further solidify that Kimble was Prima and the operator of -5267 number, subscriber information from the cellphone company identified Kimble by name as the billing party for that number and listed her home address in Hialeah, Florida. JA1370–1375, JA2178, JA2753–2760,

JA2773.

Second, the evidence recovered only from Kimble's Hialeah home provided an independent (and certainly corroborating) basis to conclude she was a member of the conspiracy. Her home contained a multitude of packaging and shipping items like black and clear tap, glue, staplers, paper, and U.S. Postal Service envelops. JA1110–1123, JA1173, *e.g.*, 2246–2250, JA2768–2770. Multiple envelopes were addressed to Kimble. JA1114–1115, JA2769, JA2771. Critically, one parcel in her home was from co-defendant Jackie Cuellar, and a separate piece of paper included the name and address of Virginia co-conspirator Catherine Rec. JA1115–1116, JA 2770, JA1116–1117, JA2772. Her home also included over two dozen cellphone sim cards and small plastic baggies commonly used to package drugs for redistribution. JA1123–1134. A reasonable jury could conclude from evidence in the house alone that Kimble was part of the same conspiracy that Cuellar and Rec were (*even if* the jury doubted Kimble was Prima).

Moreover, text messages from Bariola during the conspiracy specifically used (albeit again in misspelled fashion) Kimble's first name ("Natasia") and provided Kimble's home mailing address. JA2196,

JA2199.  Other defendants provided corroborating evidence suggesting that Kimble was Prima, explaining that Prima lived in the Miami and was female, facts that were true of Kimble. JA1251–1252, JA1441.

All told, a reasonable jury could—and did—look at this evidence and conclude Kimble was a member of the conspiracy.  That was particularly reasonable given that conspiracies "are usually proven inferentially and by circumstantial evidence," and "only a slight connection need be made linking a defendant to the conspiracy to support a conspiracy conviction…".  *Seigler*, 990 F.3d at 337.  The verdict against her on Count 1 thus should stand.

## II.    Venue Was Proper over Purks's 14 Distribution Counts.

The jury appropriately found that venue existed in the Western District of Virginia on the 14 distribution counts against Purks.  Purks was a member of the conspiracy and liable for his co-conspirators' drug distributions—namely, Mosley's and Grote's mailing of drugs on his behalf from Florida. Once those drug shipments entered the Western District of Virginia, venue was proper.

"The burden is on the Government to prove venue by a preponderance of the evidence." *United States v. Villarini*, 238 F.3d 530,

534 (4th Cir. 2001). This case presents the question of where venue lies for drug distribution, a question this Court has not yet directly answered in a published opinion. Along with other courts, two unpublished Fourth Circuit opinions have held that distribution under 21 U.S.C. § 841 is a continuing offense—the crime (and thus venue over it) is not extinguished the moment the drugs leave the distributor's immediate possession. Rather, the crime of distribution covers a course of conduct amounting to delivery of drugs, including the "actual, constructive, or attempted transfer" of them. *See* 21 U.S.C. § 802(8), (11).

So, in cases where a defendant—as a deliveryman would with common items—mails or sends or ships drugs out of one district into (or through) another, venue for the crime lays in the receiving and pass-through districts.[7]

---

[7] That is not to say venue for distribution against a defendant exists in perpetuity, wherever his drugs may eventually end up. Venue still must follow the substantive offense. For instance, if a rival dealer intercepted drugs in Virginia and distributed them in Maryland, or a Virginia end-user (*i.e.*, not a conspiracy member) unexpectedly gave drugs to a friend in Maryland, the sending defendant is not liable—either substantively or for venue purposes—for distribution in Maryland.

### A.  Purks was liable for his co-conspirators' drug distributions.

As an initial matter, Purks was legally responsible for drug shipments by Grote and Mosely and thus prosecutable for those crimes wherever venue over them existed.  The fact Purks was in a Florida jail (and thus did not himself personally send the drugs into the Western District of Virginia) is not dispositive.  The "*Pinkerton* doctrine"—named for a 1946 Supreme Court case—"makes a person liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy." *United States v. Ashley*, 606 F.3d 135, 142–43 (4th Cir. 2010); *United States v. Denton*, 944 F.3d 170, 181 (4th Cir. 2019) (explaining, in drug case, that *Pinkerton* liability exists "for the purpose of holding [co-conspirators] responsible for the substantive offense" that was reasonably foreseeable of the conspiracy).

The *Pinkerton* theory was advanced at the Rule 29 stage and in closing to the jury, which was also instructed on it.  JA1638, JA1728, JA1833, JA1842–1843.[8]  And Purks does not challenge the jury's

---

[8]    The evidence also sufficed to establish Purks was liable for the distributions as an aider and abettor.  *See United States v. Burgos*, 94

elemental findings of his conspiracy conviction or argue that Grote and Mosley's actions were not foreseeable. He is thus on the hook for those distributions wherever venue for them existed.

### B. Drug distribution is a continuing offense that establishes venue in any district where the drugs were received or passed through.

As the district court observed, JA1685–1686, the second paragraph of the venue statute, 18 U.S.C. § 3237(a), expressly provides for venue over the drug distributions at issue here. That provision instructs that any offense "involving the use of mails" or interstate commerce "is a continuing offense" and may be prosecuted "in any district from, through, or into which such commerce" or "mail matter" moves. There is no dispute that the drugs underlying the distribution counts were sent through the mails and in interstate commerce (namely, from Florida to Virginia). As such, venue laid wherever the drugs went "through" or "into," which here included the Western District of Virginia.

More broadly, though, venue also existed under the first paragraph of § 3237(a). When a drug distribution involves the delivery of drugs from

_____

F.3d 849, 873–75 (4th Cir. 1996) (en banc) (examining legal and factual overlap between conspiracy and aiding-and-abetting liability); *see also* JA1638, JA1728 (Government arguments).

one district to another, venue exists beyond just the sending district and extends to the receiving and pass-through districts. That is because distribution under 21 U.S.C. § 841 is a continuing offense, as this Court has held in unpublished opinions and as other cases explain.

For instance, in *United States v. Montalvo*, 959 F.2d 232, 1992 WL 64855 (4th Cir. 1992) (unpublished), the defendant was convicted of § 841 distribution in North Carolina for helping load a van with drugs in Texas, when the van and drugs were later seized in North Carolina. *Id*. at *3. This Court observed "venue for narcotics cases is controlled by 18 U.S.C. § 3237(a), which provides, in pertinent part, that 'any offense against the United States begun in one district and completed in another or committed in more than one district may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.'" *Id*. And because the van and drugs were seized in North Carolina, venue was proper there. *Id*.

This Court reiterated a year later that "[d]istribution under § 841(a) is a continuous offense, which is broadly read to include the transfer, delivery, arrangement of sales, and even constructive delivery of drugs." *United States v. Nunez*, 8 F.3d 822, 1993 WL 415219 (4th Cir. 1993)

(unpublished) (citing *United States v. Brunty*, 701 F.2d 1375, 1381 (11th Cir. 1983) (compiling cases)).

The district court cited both *Montalvo* and *Nunez* in denying Purks's Rule 29 motion for lack of venue. JA1683–84.[9]

Analogously, in *United States v. Gromet*, 801 F.2d 395, 1986 WL 17616 (4th Cir. 1986) (unpublished), a co-conspirator argued venue did not exist in North Carolina for drug importation that initially occurred into Florida. The Court rejected that argument, relying on § 3237(a) to conclude that venue for importation "is proper in any district through which the contraband moves." *Id*. at *3 & n.5. (Indeed, the Eleventh Circuit has remarked that the continuing nature of § 841 distribution is "reinforced" by authority finding venue for importation of narcotics "lies

---

[9] After *Montalvo* and *Nunez*, this Court—also in an unpublished opinion—stated that distribution was *not* a continuing offense. *United States v. Anudu*, 77 F.3d 471, 1996 WL 67214 (4th Cir. 1996) (unpublished). *Anudu* is distinguishable and unpersuasive. For one, that case involved distributions directly to government investigators entirely outside the district of prosecution, and thus venue was incorrectly premised only on the existence of a conspiracy generally (rather than, as here, on each distributive process) reaching the district of prosecution. And respectfully, for the reasons explained herein, *Anudu* was incorrect to conceptualize—apparently as a matter of law—a distribution, delivery, and transfer as always a "single event" rather than as a process that can span significant space and time.

in any district along the way." *Brunty*, 701 F.2d at 1382.)

These Fourth Circuit decisions align with some from other courts. The Seventh Circuit has observed that "[d]istribution of drugs can be a continuing offense" and, as such, venue against a defendant can lay when a co-conspirator causes drugs to enter another district for distribution, even though the defendant himself was never there. *See United States v. Tingle*, 183 F.3d 719, 727–28 (7th Cir. 1999) (explaining that Wisconsin venue would have been proper against Illinois defendant for co-conspirator's distribution in Wisconsin).[10] The Fifth Circuit, relying on *Pinkerton* liability and citing *Tingle*, found that distribution venue existed in the district where a co-conspirator transported the drugs "from," notwithstanding that the drugs were ultimately "delivered as part of the conspiracy to an apartment" in another district. *United States*

---

[10] In *Tingle*, Wisconsin prosecutors laid venue for the wrong distribution. Rather than charging the defendant in Wisconsin under *Pinkerton* with her courier's distribution into Wisconsin of drugs the courier received from the defendant, the Government charged (in Wisconsin) the defendant with *her* predicate distribution in Illinois to the courier.

Here, the Government did not charge Purks in Virginia with direct distributions *to* Grote and Mosley in Florida (what *Tingle* forbade). Instead, it charged Purks in Virginia with *Pinkerton* distributions from Grote and Mosley *into* Virginia (what *Tingle* permitted).

*v. Solis*, 299 F.3d 420, 432, 444–45 & n.76 (5th Cir. 2002).[11]

And in *United States v. Tiangco*—which the district court cited, JA1685, and which presented strikingly similar facts—a defendant in Nevada sent a UPS package with drugs to her brother in New Jersey that was intercepted by agents in New Jersey. 225 F. Supp. 3d 274, 279, 283–85 (D.N.J. 2016). "Venue was proper under a general 'continuing offense' theory," so her argument (like Purks's, Br. at 15) that she "acted wholly within the State of Nevada" and "performed no act of distribution" in New Jersey was unavailing. *Id*. at 283, 285. The "definitions of distribution

---

[11]    In fairness, although not cited by Purks, some circuits have occasionally remarked that distribution is not a continuing offense. A close reading reveals those cases do not support Purks.  For instance, *United States v. Corona*, 34 F.3d 876, 878–80 (9th Cir. 1994), did not grappled with Congress's definitions of distribution in § 802 and did not involve facts showing the drugs had—as here—entered the district of prosecution.  That perhaps explains *Corona*'s failure to consider how the distributive process can result in multiple proper venues.

And *United States v. Rowe*, 919 F.3d 752, 756–57, 759–60 (3d Cir. 2019), did not involve venue at all.  Instead, it was an elemental challenge to the improper aggregation of drug weight across discreet distributions that occurred over different days and weeks, based on the Government's "mistaken" and "incorrect belief that it could combine weights from multiple distributions and discontinuous possessions during the indictment period." *See also United States v. Lartey*, 716 F.2d 955, 967 (2d Cir. 1983) (concerning multiplicity).  Indeed, *Rowe* understood itself to be consistent with the possibility that venue for distribution can exist in multiple districts. 919 F.3d at 760 n.3.

and delivery are broad enough to encompass not just a physical handoff but *the entire process of sending a package to another state by commercial courier*." *Id*. at 286 n.15 (emphasis added).

The defendant "committed the drugs to a courier service, an intermediary she chose for the very purpose of having the package delivered to [] New Jersey (although it only got as far as the UPS facility in Tinton Falls, New Jersey). Thus [she] purposefully engaged in a unitary interstate transfer of drugs." *Id*. at 288. The "delivery" of Nevada-originating drugs "to the New Jersey UPS personnel" occurred in New Jersey, so venue existed. *Id*.; *accord United States v. Broussard*, No. 3:16-CR-352, 2020 WL 3839643, at *3 (M.D. Pa. July 8, 2020) (finding distribution venue in Pennsylvania under continuous offense theory where defendant mailed drugs from Minnesota via USPS parcel into Pennsylvania).

Similar logic applies here. The upshot of these cases is that venue for a § 841 distribution is not limited to wherever a defendant (or his *Pinkerton* co-conspirator) is at the literal moment the drugs leave his fingertips. Rather, assuming the substantive offense otherwise exists, venue lays both where the defendant starts the delivery process and

48

where the drugs pass through, are received, or intercepted—*i.e.*, anywhere the delivery process continues.[12] Concomitantly, venue liability of that distribution terminates wherever the drugs are no longer part of the substantive crime—for instance, wherever the drugs reach the co-conspirator, or wherever they are intercepted by law enforcement.

Often in drug distribution cases, the entire process of delivery will be in the same district, as when a local dealer supplies drugs to a local buyer. But sometimes—such as with large or sophisticated drug trafficking organizations, or when defendants use the mail to ship drugs—the delivery process can generate venue in multiple districts.

A simple example illustrates the point. Consider someone who tosses a baggie of drugs from his car "into the passenger window of" an adjacent car stopped in the road. *United States v. Hale*, No. 7:19-CR-004, 2023 WL 6465141, at *1 (W.D. Va. Oct. 2, 2023) (recounting similar fact-pattern). And say the toss took place on State Street in Bristol—a street the center line of which literally divides Tennessee from Virginia. It

___

[12] An analogous rule governs mail and wire fraud, for example. *United States v. Powers*, 40 F.4th 129, 136 (4th Cir. 2022) (finding venue wherever the wire or mailing "originated," "terminated," or "passed through.")

would seem strange to conclude that venue for distribution must be *exclusively* in either Tennessee *or* Virginia, when the course of conduct was continuous (albeit temporally brief) and parts of the delivery process occurred in *both* places.

The only difference between the State Street toss and mailing drugs from one district into another is one of degree, not kind:  How long— literally, how much distance and thus how much time—the delivery process takes.  In this case, Purks and his conspirators simply used the mail to make (very) long passes of drugs into Virginia, ones that arm-strength alone could not have accomplished.  In so doing, they exposed themselves to venue in multiple districts.

That commonsense result is confirmed by the relevant statutes.  Any offense is prosecutable wherever it "was begun, continued, or completed." 18 U.S.C. § 3237(a). "Distribute" in § 841 means "deliver," and "deliver" in turn means the "actual, *constructive*, or *attempted* transfer" of a drug.   21 U.S.C. § 802(8) (emphasis added), (11).  Transferring drugs—whether actually, or constructively, or whether attempting to do so—thus encompasses a course of conduct that may occur in more than one place, over a period of time, or both.

That is true whether the defendant himself tosses drugs across district lines (like our State Street example), has a courier drive them from one state into another (as in *Montalvo* and *Tingle*), or uses unwitting postal carriers to deliver them up the coastline (like in *Tiangco* and *Broussard*). In the parlance of § 802(8), Counts 3 through 10 involved the "actual transfer" of drugs to co-conspirator Rec in Virginia, and Counts 12 through 17 involved the "attempted transfer" of drugs to her when they were intercepted at a Virginia post office.

Purks's contrary arguments miss the mark. Although he states that "intent elements" and "circumstance elements" do not establish venue, Br. at 14, venue here was not premised on such elements. Instead, it was established by the core conduct element of § 841 distribution—delivery as defined by § 802. Purks's reliance (Br. at 14–15) on *United States v. Umana*, 750 F.3d 320 (4th Cir. 2014), is also unavailing, because that case concerned venue over a different statute with different elements in an entirely different chapter of the U.S. Code—murder in aid of racketeering under 18 U.S.C. § 1959.

Moreover, for the reasons explained and authorities given above, Purks is simply incorrect to state that the crime was "completed" for

venue purposes when Purks's *Pinkerton* co-conspirators "relinquished possession" of the drugs to the U.S. Postal Service. Br. at 15–16. Rather, because distribution includes the entire process of (actual, constructive, or attempt) "delivery" and "transfer," and is a continuing offense, venue laid where the drugs ended up as part of the conspiracy—in Virginia.

### C. The drugs entered the Western District of Virginia.

Factually, the evidence established by a preponderance that the drugs entered the Western District. The summary chart on pages 18–19, *supra*, includes references to evidence showing drugs representing all 14 counts were addressed to Rec's Virginia address. Exhibit 521 and postal records established that the drugs underpinning Count 3 through 10 were in fact delivered to Rec's home, corroborated by (A) Rec's testimony about "regularly" receiving drugs in the mail during the conspiracy, and (B) the physical seizure of the drugs at her home underlying Count 10. JA569–570, JA818–819, JA1030–1032, JA1035, JA1037, JA1043, JA1045–1046, JA1068. Further, for Counts 12 through 17, Postal Inspector Chavez testified that the drugs were seized in the district at the Stephens City post office. JA822–826, JA833–839, JA839–842, JA843–845, JA845–850, JA850–852. Venue was thus laid in the Western

District of Virginia.

## III. Purks's Statements Were Correctly Admitted.

To overturn the district court's admission of his statements, Purks must establish either (1) they were involuntary, or (2) he was in custody for *Miranda* purposes *and* invoked his right to counsel. Purks fails at each turn. Indeed, he has waived these arguments by failing to develop them and, even if they were meritorious (they aren't), any error was harmless given the weight of the evidence and the minor role the statements played at trial.

### A. Purks waived review of the district court's predicate fact-finding, and his legal arguments take only a "passing shot" at the issues.

"A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." *United States v. Taylor-Sanders*, 88 F.4th 516, 525 n.5 (4th Cir. 2023). Purks failed to challenge the district court's predicate fact-findings as clearly erroneous in his opening brief, and therefore has waived review of those facts. That ultimately dooms his legal arguments, which additionally are nothing more than an insufficient "passing shot" at the issues.

Purks does cite parts of the evidentiary record, including some of his self-serving testimony about invoking his *Miranda* rights, in his "Statement of Facts." Br. at 16–17. But the district court made specific factual findings about Purks's interview that supported its ultimate determinations about voluntariness and the *Miranda* issue, and Purks leaves unchallenged those critical findings, such as:

- Agents "did not physically restrain or threaten Purks," and they did not "touch, yell at, or threaten him." JA2636, JA2638.

- They "were not armed and the tone of their conservation with Purks was by and large respectful." JA2636.

- Purks was "free to end the conversation" and be returned to his cell. JA2636.

- The conversation "was voluntary, respectful, and at times even friendly." JA2637.

- Purks "said he was" "willing to answer question." JA2638.

- Purks at times admittedly was "smart alecky" and "was laughing and smiling." JA2638.

- Even "assuming the truth" of Purks's allegation that Florida prison officials beat him a few days earlier, "the evidence d[id] not demonstrate" federal agents "ordered" the beating, coerced the interview under threats of future beatings, or "even knew Purks was allegedly beaten until he told them at the interview." JA2638.

Further, the "court credit[ed] SA Hickey's unequivocal testimony that Purks never asked for a lawyer over" the testimony of Purks—a five-time

felon with an incentive to lie—"that he did invoke his right to counsel." JA2637. By not arguing—much less showing—that these underlying facts were clearly erroneous, they must be taken as true when considering the voluntariness and *Miranda* issues.

Moreover, on each of those issues, Purks's analysis is a one-sentence, conclusory statement. On voluntariness, he simply alleges that his (supposed) beating by *state prison officials* somehow "served to overbear" his will when speaking to *federal agents* days later. Br. at 20. On his custodial status, he offers only the *ipse dixit* that "there can be no doubt" he was in custody because he was already in prison with three agents in a room. Br. at 21. And regarding whether he invoked his *Miranda* rights, he makes no effort to impeach what was a routine credibility finding the district court made against him. Br. at 22. Purks thus "fail[ed] to develop [his] argument" by taking, at most, only a "passing shot" at the legal issues. *Taylor-Sanders*, 88 F.4th at 525 n.5.

## B. Purks's statements were voluntary.

Regardless, the district court did not err in finding Purks's statements voluntary under the Due Process Clause. "In determining whether a confession was voluntary, we must examine the totality of the

circumstances, including the nature of the police activity, as well as the defendant's situation." *United States v. Ayesh*, 702 F.3d 162, 168 (4th Cir. 2012). Factors include "the length and nature of the questioning, any promises or threats made, and any deprivation of essentials," plus "the defendant's personal attributes, such as his age, education, intelligence, and mental state." *Id*. An "appellate court must make an independent determination on the issue of voluntariness," while accepting "the district court's findings of fact on the circumstances surrounding the confession unless clearly erroneous." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997).

The district court found: (1) the conversation between Purks and agents was "respectful" and "at times even friendly"; (2) Purks was asked and expressly answered that he was willing to answer questions; (3) Purks additionally was given a *Miranda* warning, putting him on notice that he did not have to answer questions; (4) agents did not "touch, yell at, or threaten" him, and; (5) Purks was "laughing and smiling" and admittedly "gave smart alecky answers," which the district court rightly inferred was "hardly consistent with someone" who was supposedly so fearful of impending harm that his will was overborn. JA2637–2638.

Agents also were unarmed and "respectful" in tone. JA2636.

Further, the district court noted Purks was no stranger to "interactions with the criminal justice systems and related police interactions, given his multiple prior convictions." JA2638. The court also rejected Purks's conclusory contention that federal agents were somehow responsible for an earlier beating by state prison officials, assuming it even occurred. JA2638–2639. The "record [did] not support a finding that the federal agents engaged in coercive activity." JA2639.

The district court got it right. Purks "never requested not to be interviewed due to pain," *see United States v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002), and indeed expressly consented to being interviewed. "No officer harmed or threatened to harm" him "if he did not waive his rights and answer" questions. *See id*. Instead, Agent Hickey "introduce[d] himself" to Purks, "advise[d]" him "of the nature of the investigation," and "read" him "his *Miranda* rights." *See id*. (finding voluntariness, even though defendant had been on "pain killers and narcotics"); JA94–95, JA108. When asked whether he doing "okay," Purks explained he was "all right. You know, I'm good." JA107; *see United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012) (finding voluntariness where, inter alia,

defendant explained he "felt fine").[13]

"Because the police activity used to elicit an incriminating statement must be coercive before a statement will be held to be involuntary, it is not surprising that very few incriminating statements, custodial or otherwise, are held to be involuntary." *United States v. Williamson*, 706 F.3d 405, 414 (4th Cir. 2013). That holds true here.

## C. There was no *Miranda* problem.

Nor was there a *Miranda* violation. Purks expressly conceded below that he "was given a *Miranda* warning." JA68. Thus, to prevail on his *Miranda* claim, Purks had to demonstrate he was both in "custody" as that term in legally defined (a showing without which a *Miranda* warning was not even legally required) and that he invoked his right to counsel. Purks failed both requirements.

### 1. The district court did not clearly err by crediting Agent Hickey's testimony that Purks failed to invoke any rights he had.

As an initial matter, there is no need to reach the custodial

---

[13]     Of course, the fact Purks was incarcerated was not dispositive, which is in keeping with the totality-of-the-circumstances test. *See, e.g.*, *United States v. Gray*, 137 F.3d 765, 768, 772 (4th Cir.1998) (finding voluntariness even though defendant was handcuffed in police station for almost two hours and interviewed for five hours).

question—*i.e.*, the triggering condition for whether a *Miranda* warning was even legally necessary. Assuming for argument's sake that Purks was in custody and thus a *Miranda* warning was required, it was given here, as Purks conceded. JA68.

Hence, to show a *Miranda* violation, Purks needed to ask for an attorney to invoke any rights he had. The district court made the factual finding—which was premised on a credibility determination—that Purks failed to ask for an attorney or invoke his rights. That finding was not clearly erroneous, so the analysis of the *Miranda* issue can stop there.

Whether Purks said anything to invoke his rights was a quintessential credibility determination firmly committed to the district court. Fact-finders like district judges, "using common sense and their faculties of observation[,] can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination." *United States v. Harris*, 995 F.2d 532, 535 (4th Cir. 1993). "When factual findings are based on the credibility of witnesses," this Court affords "great deference to the district court's determinations," disturbing them only when "objective evidence contradicts the witness'

story or the story is so internally inconsistent or implausible that a reasonable finder of fact would not credit it." *United States v. Doctor*, 958 F.3d 226, 234 (4th Cir. 2020).

The district court was faced with competing testimony. On one hand, Agent Hickey testified Purks never asked for a lawyer. JA104. On the other, Purks claimed he did. JA123, JA126. The district court credited Agent Hickey's "unequivocal testimony" over Purks's story. JA2637. Crediting Agent Hickey was not "so internally inconsistent or implausible," or so contradicted by "objective evidence" as to be clearly erroneous. *See Doctor*, 958 F.3d at 234. Indeed, it was entirely reasonable. As the district court observed, Purks's credibility was impeached by his five prior felony convictions and his admission to concealing the contraband phone (which he initially lied about to prison officials). *See* JA2637. Additionally, Purks had an incentive to falsely testify in hopes of having his incriminating statements excluded from trial. All told, the district court did not clearly err in crediting Agent Hickey over a five-time felon with a motive to lie.

## 2. The interview was not "custodial" under *Miranda*.

Even if the district court's credibility finding was erroneous, the

court was still correct to find there was no *Miranda* violation. That is because the interview was not "custodial" for purposes of triggering *Miranda* at all. Purks was not in custody as that term is legally understood. "A prisoner who is questioned by police is not necessarily in custody for purposes of the *Miranda* rule." *United States v. Riley*, 920 F.3d 200, 205 n.2 (4th Cir. 2019) (citing *Howes v. Fields*, 565 U.S. 499, 512 (2012)).

*Miranda* warnings do not apply to "all questioning, only to interrogations that are 'custodial.' Whether an individual is in custody is a fact-specific, objective inquiry into the totality of the circumstances. That inquiry asks whether a reasonable person would perceive his freedom of action is curtailed to a degree associated with formal arrest." *United States v. Arce*, 49 F.4th 382, 389 (4th Cir. 2022). The "custody in a technical sense to which prisoners are routinely subjected is not the coercive custody contemplated by *Miranda*." *United States v. Holness*, 706 F.3d 579, 595 (4th Cir. 2013).

As the Supreme Court explained, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 565 U.S. at 508–09 (declaring "simply wrong"

a "categorical rule" that custody exists for private questioning in prison setting about outside events). The fact a person was an inmate at the time of questioning does not automatically render him in "custody" for *Miranda* purposes, even if he has been "removed from the general prison population and questioned." *Id.* at 505.

To conclude otherwise "would be directly at odds with established constitutional doctrine that while persons in government-imposed confinement retrain various rights secured by the Bills of Rights, they retain them in forms qualified by the exigencies of prison administration and the special governmental interests that result." *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985). And, acknowledging the Supreme Court's decision in *Howes*, Purks conceded below that the fact of incarceration alone could not make his interrogation custodial. JA71, JA152.

"Not all restraints on freedom of movement amount to custody for purposes of *Miranda*," and "standard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the [Supreme] Court sought to protect." *Howes*, 565 U.S. at 509, 512. Thus, when questioning pertains to conduct unrelated to the

charge on which the inmate is incarcerated, the inquiry focuses on whether there has been "a change of surroundings of the prisoner which results in an *added* imposition of his freedom movement," such that it would be "of the degree associated with a formal arrest." *Conley*, 779 F.2d at 973 (emphasis added).

That inquiry first considers "all the circumstances surrounding the interrogation," including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interview," and then—if he was not free to leave—"whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *United States v. Leggette*, 57 F.4th 406, 410 (4th Cir. 2023) (outlining two-step inquiry). When considering the effect of physical restraints on an inmate, the court "seek[s] to identify whether the restraints on the defendant were incident to his interrogation or were merely background limitations imposed on all prisoners in his situation." *Jamison*, 509 F.3d at 629.

The district court correctly concluded the totality of the

circumstances showed Purks was not in custody.  Analogizing to *Howes*, the interviewers did not restrain or threaten Purks (the restraints he had were simply background limitations on prisoners), and Purks was placed in an office room from which he could have left when accompanied by prison officials.  JA2636.  Far from the interview resulting "in an added imposition of" Purks's freedom, *Conley*, 779 F.2d at 973, the interview garnered more lenient conditions: Purks was in an office rather than his jail cell, and indeed got to leave his more restrictive environment of solitary confinement.  JA121, 131. In fact, the circumstances here were less intimidating than in *Howes* (where the Court also held the defendant was not in custody), therefore showing *a fortiori* that Purks was not either.  Agents were not armed and were respectful, whereas in *Howes* the officers were armed and used profanity.  JA2636.  In short, Purks was not in a more restrictive environment during the interview; if anything it was more laissez faire.  He therefore was not in custody, meaning *Miranda* did not apply and that any such claim must fail.

**D.    Any error was harmless.**

Lastly, akin to *United States v. Horsley*, 105 F.4th 193, 216–17 (4th Cir. 2024), any error in admitting Purks's statements was harmless.  Like

*Horsley*, multiple co-conspirators (Rec, Gates, Grote, Mosley, and Butler) inculpated Purks. *See id.* Like *Horsley*, the co-conspirator testimony was corroborated by significant text message evidence. *Id.* And like *Horsley*, law enforcement executed numerous controlled drug buys, seized significant quantities of drugs and evidence of drug payments, and recovered other items proving a large drug conspiracy. *See id.*

Further, just as *Horsley* found a few pieces of evidence "were not critical to the Government's case," *id.* at 216, Purks's statements were a small part of trial. JA1324. They were brief and consisted of merely a few lines of transcript in a trial that occupied hundreds of pages, across several days, with hundreds of documentary and physical exhibits that corroborated numerous co-conspirators' testimony. So, the convictions stand even without Purks's confession.

## CONCLUSION

For the reasons above, this Court should affirm.

## STATEMENT REGARDING ORAL ARGUMENT

The Government does not request oral argument.

Respectfully submitted,

Christopher R. Kavanaugh
United States Attorney


/s/ *S. Cagle Juhan*
S. Cagle Juhan
Assistant United States
Attorney
DC Bar No. 102293
Cagle.Juhan@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is approximately 12,487 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/ *S . Cagle Juhan*

S. Cagle Juhan
Assistant United States
Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2024, I electronically filed the foregoing Brief of the United States with the Clerk of the Court using the CM/ECF System, which will send notice, and constitute service, of such filing to the following registered CM/ECF user(s): all counsel of record for the Appellant. The sealed version of this brief will be sent to Appellant's counsel.

*/s/ S. Cagle Juhan*

S. Cagle Juhan
Assistant United States
Attorney